## JONES et al. vs. JOHNSON et al.

BETTERMENTS: *When may be set off against rents and profits.*

Where a person, without individual right, with his children who are part of the heirs, lawfully comes into possession, and voluntarily holds possession of the inheritance, while he cannot lawfully demand payment for betterments put thereon without the consent of the other heirs, yet in right of his children as heirs, he and they can hold the possession of the same until partition is made, and while thus tacitly holding, may be allowed to set off improvements against rents and profits; but improvements, not made with the knowledge and consent of the other heirs, cannot be charged against the body of the estate.

Jones et al. vs. Johnson et al.

APPEAL from *Yell* Circuit Court.

Hon. W. N. MAY, Circuit Judge.

*Fay Hempstead*, for appellants.

GREGG, J.   On the 29th of March, 1869, the appellants brought their complaint in equity in the Yell circuit court.

They alleged that they and the appellees were heirs of Lewis D. Johnson; that he died in March, 1860, seized and possessed of three hundred and twenty acres of land and considerable personal property, situate in said county, and of the aggregate value of several thousand dollars.   That Nelvina and her children then resided on the premises of Lewis; that they retained possession of the lands and converted the personal property to their own use, without administration or in any way accounting for the same.   That complainants were nonresidents, and before their rights could be secured, all communication was cut off by the war of 1861; after the close of which, the appellees claimed to be the owners of the whole of Lewis Johnson's estate.

They prayed that the defendants be required to make answer, etc., and abide, etc.   Nelvina and several of her children answered jointly, and admitted the relationship of the parties as alleged, the residence and death of Lewis D. Johnson, the death of his brother Robert A., and her possession and use of the property of which they died possessed, and that no administration was ever had; that Lewis came to Arkansas in 1858, as alleged, and that about one year thereafter he purchased of Hollowell the lands in litigation, but they deny that he died seized and possessed thereof, and aver that he came to Arkansas as the agent of his brother Robert A., the husband of Nelvina, and purchased these lands for him and with his money.   They do not deny that Lewis improved the land, but aver that, after his death, they improved them to

the value of three thousand dollars. They declare that Lewis' personal estate was worth about $250 or $300, and that there were debts against it of about equal value, and that for the good of the estate Nelvina assumed and paid off the debts, and retained the personal property.

Nelvina set up title to the land under a deed from Hollowell, and in addition to that they claimed a right to both real and personal estate by limitation, possession and adverse claim for many years, etc. A general replication to this, and the minor's answer interposed, and proofs were taken.

Whether Lewis Johnson, in the purchase of these lands, used his own money, and acted for himself, or used Robert Johnson's means, and acted as his agent, is the real controversy; hence the voluminous depositions in this cause may be eliminated of about all that relates to parties, description, possession, improvements, values, etc., and further, we may assume, though the testimony is not without conflict, that the liabilities of Lewis' estate and the personal property thereof are about equal.

We will, therefore, endeavor to confine our quotations of testimony to such as bear upon the main points in issue, except where the general tenor of the proof seems necessary to show its full weight, or where statements contradictory have been made tending to affect the credibility of some of the witnesses.

The death of Lewis and Robert Johnson, of Hollowell, and the mother of Lewis, shut off important avenues to direct and satisfactory proofs; the delays caused by the war, and important papers being in hands that do not preserve and produce them in evidence, tend also to increase the difficulty in finding the facts.

Luise testified that soon after Lewis Johnson died, Nelvina said to him there would have to be an administration on Lewis'

estate, and she wanted him at the proper time to assist in appraising it; after that she said there would be no necessity to administer, as her children were Lewis' only heirs, and that Mr. Hollowell had made arrangements for her to get title to the land by paying the balance due on it.

Thaddeus Johnson testified on the part of the appellants: That exhibit X, No. 1 (a letter dated February 4, 1861), was in his handwriting and signed by him, and to exhibit X, No. 2 and No. 3 he recognized his mother's name; that No. 3 was in his handwriting, and No. 2 might be also, but as to that he could not state positively; that he was in the habit of writing letters for his mother to North Carolina in 1860 and 1861; that he wrote in different hands; that at the time of Lewis' death, his mother was living; that the letter dated June 19, 1860 (exhibit X, No. 2), contained about a correct statement of the personal estate of Lewis; that he did not know whether the place where Lewis lived and died was his or not.

Thomas Graves testified that he lived on the premises and worked for Hollowell; that Lewis Johnson came there and said he had bought the lands, and afterwards Hollowell told him he had sold the place to Lewis.

Samuel S. Kimball testified that in 1858–9 and '60, he was a merchant at Dardanelle, Arkansas, and that he never cashed any checks for Lewis D. Johnson.

Eglebright testified that he knew from Lewis D. Johnson and Hollowell that Lewis bought the land now in controversy at $6.25 per acre, in the fall of 1858; that in the spring of 1859 he saw a deed from Hollowell and wife to Lewis; that he heard Hollowell speak of an occurrence that took place, as he said, the day he made Lewis a deed, and he heard Lewis say he had paid up every dollar he owed and had a little money left; that he heard Robert A. Johnson say he would not be able to purchase a home and provisions for his family and

would have to rely on what Lewis had; that Robert and Lewis went to the U. S. land office and, as they said, entered the Gid. Underwood place, which joined Lewis,' and Robert said he was going to build on that; that in 1860, Thaddeus and Berry Johnson both admitted that Lewis owned the lands whereon he died; that in the spring of 1859, he saw a letter from Robert to Lewis, in which he wrote he had collected $1,900 for Lewis, and inclosed checks for the amount, which checks were cashed by Samuel Kimball, a merchant of Dardanelle; that before he left home in Iowa, he received from Mrs. Jones $50, and since coming here, $15 more, to pay him for coming as a witness, and was to be paid all his expenses coming down and returning; that he offered to come for $100 if she gained the case, but she did not accept or reject that offer; he wrote her that he had seen the deed from Hollowell to Lewis; that he was positive that Ellen F. Hollowell signed the deed, and that it was for 320 acres; that Lewis told him that he was purchasing the lands for himself, and with his own money; that witness did not come here for the money, but to see his kin, when he could get his expenses paid.

Mrs. Ricks testified that formerly she was the widow of Henry Johnson; that in 1859, Robert Johnson several times told her he was the agent for Lewis to collect money for him in North Carolina; that he had made collections of a part or all and remitted the same to Lewis, who had purchased lands in Arkansas and used the money in paying for the same; that in 1869, she got of C. B. Killebrew, of North Carolina, two letters purporting to have been written by Nelvina Johnson, at Dardanelle, Arkansas, in the year 1860, concerning the estate of Lewis Johnson, that she took copies and returned them to Killebrew, and mailed the originals to D. H. C. Moore, an attorney at Dardanelle, Arkansas.

John Neflea testified that he was judge of the county court

in Edgecombe county, N. C., and clerk of the supreme court; that he had lived in said county fifty-one years; that several of the complainants had been raised near him; had known the family well twenty-five or thirty years; before Lewis Johnson left North Carolina he was employed as an overseer by wealthy cotton planters; that he was a man of industrial, frugal habits; that good overseers on large farms then obtained from $400 to $800 per annum; that he had known Robert Johnson for twenty-five years; that in 1857-8 and '9, he had several conversations with him in reference to Lewis Johnson and his business; that Robert said that he was Lewis' agent, and had his notes and claims to collect for him from persons in North Carolina, who owed him for borrowed money and for overseeing; afterward, he said he had collected the notes and asked advice as to the manner of remitting the money to his brother. In one conversation, he said his brother Lewis had purchased lands in Arkansas, and wanted the money to pay for them, and he advised Robert to remit in drafts on New York, and he thereafter showed him the drafts purchased for that purpose; that Robert never spoke of sending any money of his own; that Robert was a man of poor health, had a large family, cultivated poor land and never had but little money over what was absolutely necessary to support his own family until he sold to leave the state, and that he moved in a few weeks after selling; that the record of deeds shows he conveyed his lands December 13, 1859. Shortly before this sale and several months after, he spoke of Lewis' purchase of lands. Robert said to him, he had determined to sell and remove to Arkansas where his brother Lewis was, and that he had so written to him and requested him to buy a piece of land for him near Lewis' own land.

L. C. Pindar testified that Robert Johnson had bad health, a large family, lived on poor land, and never made but little,

if any more than a bare support; that he had known the parties a great many years; that he never knew or heard of Robert selling any property until just before leaving North Carolina; that for several years before Lewis Johnson removed to Arkansas, he was employed by wealthy cotton planters as an overseer, and received good wages therefor; that he saved money, was of good habits, etc.

C. B. Killebrew testified that he had lived in Edgecombe county over fifty years; had intimately known the parties for 20 or 30 years — several of them from their infancy; that he was intimate with Robert A. Johnson, was a witness to his deeds when he sold his lands; that he was his agent to settle his outstanding business in North Carolina to collect the notes he had left, etc. ; that Robert made but little money, etc., and sold no property until just before removing; that he talked to witness about Lewis Johnson having bought lands and settled in Arkansas, and said he was going to sell and move where Lewis was, but never spoke of having purchased lands himself; that from his knowledge of Robert's business affairs he knew he could not have purchased lands before he sold.   That Robert told him that he was Lewis' agent to collect for him, etc. ; that in 1860, by the ordinary course of mail, witness received two letters from Nelvina Johnson, in reference to Lewis Johnson's estate, one dated June 19th the other August 16th, which letters he turned over to Mrs. Mary Ricks; that he was of kin to none of the parties unless it was by being a third or fourth cousin to Mrs. Ricks, who was the mother of Henry Johnson's children.

The complainant, Elizabeth Jones, testified that in 1850, she heard her brother Lewis estimate his property at from five to six thousand dollars; this included a piece of land he had inherited.    That her brother Robert acted as Lewis' agent in North Carolina.  At his house in Dec. 1858, she saw him with a thous-

and dollars, that he said was Lewis' and asked her husband how he had best send it, and said there was a good deal more due Lewis; that Lewis had bought land and wanted money to pay for it; that she then saw a letter from Lewis to Robert requesting him to send all the money he had collected; that he had bought land, etc; that she knew exhibit X, Nos. 1 and 4, No. 2, attached to the depositions of Lewis and others to be in the handwriting of Thaddeus; that she received three letters from Lewis in 1859, exhibits Nos. 3, 4 and 5; that Nelvina Johnson was illiterate, and Thaddeus Johnson was accustomed to write for her; that Robert Johnson had a wife and nine children to support; was pressed in money matters and he said he was in debt the year before he removed to Arkansas; that in North Carolina Robert owned a two story frame house, two negro women and two children, several horses, two mules, a lot of hogs, some cattle, some smith and carpenters' tools, etc.

Lewis Johnson before leaving North Carolina said he was tired of overseeing; that he had money enough to buy him a good home and was going to Arkansas, etc., and several times, thereafter, he wrote her he had bought lands, but did not ever intimate that he had bought any for Robert; that in 1861, she saw different letters in Thaddeus Johnson's handwriting, in which he stated that Lewis Johnson's mother was entitled to all his estate and estimating its value at two thousand dollars. In 1861, Thaddeus wrote to North Carolina that Lewis Johnson's estate was insolvent; that she knew his handwriting; that she had not seen him write for ten or twelve years, and that he wrote in more hands than one.

Adam Thomas testified that he lived with Lewis Johnson part of the year 1859, and heard him say he had bought the land on which he lived; that he exhibited to witness a paper which he told him was a title bond for his land; heard him say he had made a payment on the land, but could not say

that he said the land was his own, or that it was for any one else; he spoke of improving it.

The letters marked exhibits 3, 4, 5 and 6, purporting to have been from Lewis Johnson, with much other matter, contained the following in effect: They were all dated Dardanelle, Arkansas. No. 6, Nov. 20, 1868; said he had bought 320 acres of land on Delaware Creek, two miles from the Arkansas river, it lies on Stage road, * * * could send anything to New Orleans and not haul over two miles * * * he was boarding with Mrs. Englebright and building him a house, * * * two rooms 18 feet square, etc.; that he would try this country and did not know that he would ever see them again, * * * he might sell out next fall, etc. No. 5, April 7, 1859. He said he was in great trouble; that he had directed Robert' to send him all his money, and in January he wrote that he had done so, and it had not been heard from, and he never expected to get it; that he bought the land with a view of getting the money and paying for it; went to work in November and worked here to get it fixed up; had a nice frame house, nice garden, had worked harder than ever before, and now if he lost it all, he never wanted to see his relatives again, etc.; that his place was a pretty one, and he would be right well pleased if he could get his money and have something to go upon.

No. 4. May 25, 1869. He spoke of the money having come; said he had good water and a very pleasant place to live; had ten acres of corn planted, fifteen more cleared to plant; that he was tolerably well pleased with his land and place, and did not know that he should ever go back, etc.

No. 3. October 24, 1869. He speaks of his new ground crop, barn, garden, etc.; said Robert was to come out in the fall, and if he did not, they need not be surprised to hear of his being married in the winter, etc.; said he would be satis-

fied to live here if some of his kin and acquaintances were near; that he had a piece of good land, etc.

Exhibits Nos. 1, 2 and 3, except some matters as to the health of the family, etc., not important to state, are as follows:

Exhibit No. 1. Dardanelle, Ark., February 4, 1861. Letter from Thaddeus to his grandmother. * * "The reason why we settle the estate without administering is, because it costs so much to administer here; we did it in your favor, not in our own. If I was to administer it would cost you two hundred dollars, and as it is, it will not cost you anything unless you see proper to give us something for our trouble. If we had got any other person to have settled it in the same way, it would have cost you right smart, for it was right troublesome. I can't tell you what the lawyers will charge for the writing. I have seen two letters stating, they did not believe it all went to you; the first one was from aunt Elizabeth Jones; said she did not believe it all went to you; the other one was from aunt Mary J. Peel to Hollowell, stating she wanted her share of the property, when she knows we wrote, it all went to you, and you could do as you pleased with it. But it looks to me like, they did not want you to have it all. I will speak for myself; I am and have been all the time willing for you to have it, and mother says she is perfectly willing for you to have it," etc.    "THADDEUS JOHNSON."

Exhibit X., No. 2. Letter from Nelvina to C. B. Kellebrew, June 19, 1860. * * "I will answer your letter according to your request as well as I can. I cannot tell you all about it, for I do not know myself. Lewis did not have any will at all, and for the land, it was not appraised at all, for he had not paid for it all; there was a note of $500 on it, bearing ten per cent. interest, and the land was held for security until it was paid, and he had not received a deed, so I take up

that note and pay off the same as Lewis did for it, and by doing so, I can hold the land. I have to pay over $2,000 for the 320 acres of land, but there is only $1,500 of it to go to his mother, the balance of it on that note and the interest; it has been on interest ever since he bought it. Here is what the property was valued at: Improvements, $181.50; one mule five years old, $80; one mule two years old, $55; one cow and calf, $12; lot of hogs, $8; corn, 100 bushels at 75 cents per bushel, $82.50; Irish potatoes, 10 bushels, 50 cents per bushel, $5; fodder, 800 bundles, $1.50 per cwt., $12; one shot gun, $15; for household furniture, he had none; there was a family living with him and he used their things; the $2,000 checks, as my husband sent him he only paid $1,500 of it on the land, and the balance he had to live on it last year and buy his stock. For the meat, we paid for that after we got here; he had sold some of his corn before we got here, for 50 cents per bushel, and he owed over $200, besides his doctor's bills. I don't know how much that is; the doctor has gone to the Baltimore convention; his store account for last year was $66.45 at one store; at the other store he paid his account himself. We have paid up nearly all he owed except the doctor's fee. We would not pay the first accounts until we had them sworn to, and taken a receipt for them all. We go by the advice of our lawyer, and he will see as it is all done right. We are bound to work by the law of Arkansas in settling that business.  *  *  Please write me soon as you get this; whether you get it or not, I have your receipt. Yours truly. I will write again in a few days.                       NELVINA JOHNSON."

Exhibit No. 3. A letter between the same parties, dated Aug. 16, 1860, in which the business of Lewis' estate is referred to at great length, detailing the reasons for, and amount of his indebtedness, the amount he had paid on the lands, the

probable amount of personalty, over the debts of the estate, and showing that there would be $1,650 due to his mother as heir; stating why she desired to hold the land; how she proposed to wind up the estate, and how she desired to have certain funds transferred to his mother in discharge of the liability of the estate, etc., not necessary to copy at so great length here.

This is the substance of all the proofs introduced by the appellants on the main issues.

On the part of the appellees, Thaddeus Johnson testified: That the deed exhibited was the deed made by Hollowell to his mother; that she had been in quiet, peaceable, uninterrupted and continuous possession, from the date of the deed up to the present time, holding and claiming adverse to claimants and all others; and that no one had claimed any interest whatever therein until the institution of this suit. That Nelvina paid taxes for the year 1860, and back taxes during the war, and taxes since the war, etc.

That in the year 1858, Lewis D. Johnson, at the request of Robert A. Johnson, came to Arkansas to hunt up a location for Robert, and about one year thereafter, he wrote to witness' father and mother that he had found a place he thought would do, describing the lands in controversy, and requested Robert to send out $2,000 to pay for the lands, which amount he sent in drafts; that witness wrote the letter for his father, and two or three months thereafter Lewis wrote that he had received the money and paid $1,500 on the land, and had to use $500 to buy stock and provisions, and to make improvements on the land; that he, Lewis, had no means of his own. That Lewis Johnson did not claim the lands as his own, but when they arrived here, told witness' father that this was the land he had bought for him, and as soon as he could get up the balance of the money, he had better go down and get a deed from Hollowell. That it was the full understanding in

the family, that these identical lands were paid for out of Robert A. Johnson's money, and the deed was to be made to Nelvina, because her lands had been sold in North Carolina. That Lewis Johnson was a poor man and not able to buy lands; that Lewis stated in a letter that he did not have means to buy even provisions. That to the best of witness' recollection he was not authorized by Nelvina Johnson to write that Lewis Johnson or his mother owned or claimed any interest in these lands; he might have stated such a thing in some of his letters to his grandmother, but if so, it was contrary to the facts as they existed then and as they exist now. It might be possible that he intended to state such as a rumor in this country, being young, wild and thoughtless. That he did not recollect ever to have written anything about the property of Lewis D. Johnson; probably he did so as he was a rattling young man. That he was in the habit of writing letters for his mother in 1860 and 1861, and signing her name to them; sometimes he read them over to her, but often he did not do so; that he and his mother paid debts, etc.

Nelvina Johnson testified the same, and fully stated all facts necessary to a defense, as they were given by Thaddeus; that she never authorized Thaddeus or any one else to write or state to the mother of Lewis, or any one else, that she or Lewis ever had or was entitled to any interest in said lands; that she never knew any such letter was written until a short time ago; that she never told any one that she and Hollowell had arranged for her to get a title to the land upon the payment of the balance of the purchase money, nor had she ever represented that her children were the only heirs of Lewis Johnson; that in 1860, she paid Hollowell $500 and interest thereon, of her own money; that at Lewis' death he had no money; that he was poor, etc.; that she never had any letters written to any one in North Carolina about Lewis' estate; that her children

wrote what they chose to write without authority from her, and some of them may have written about family matters; that C. B. Killebrew was her husband's agent in North Carolina to collect his notes, etc., there, and if she ever got any letter from him she did not recollect it.

Green B. Johnson testified, substantially, to the very same facts deposed to by Thaddeus and his mother. He states that when Lewis left North Carolina he had no money and only one old buggy, one saddle and sixty or sixty-five acres of land; that Lewis was poor, etc., that he came to Arkansas as agent for witness' father; bought the land with his money, etc., etc., the same as stated by Thaddeus.

William D. Jacoway testified that he heard Lewis Johnson say his brother Robert desired to buy a farm in Arkansas to move to, and when Lewis examined the lands in controversy, he heard him say he would write to his brother and give him a description of the lands and terms of sale, and he thought the place would suit him, and if so, his brother would send him the money to purchase the land, and afterward he said his brother had concluded to take the land, and afterward again he said he had bought the land for his brother Robert. After the purchase, he knew Lewis recognized the land as Robert's, and frequently spoke of it as his, and expressed an anxiety for him to arrive, so a deed could be made to him. Witness regarded Lewis as a man of very limited means; that he went poorly clad, and died in debt.

Mrs. Ellen F. Gulley, the sister of witness Jacoway, and formerly the wife of Hollowell, testified to having heard Lewis D. Johnson making statements in regard to the lands substantially the same as those deposed to by her brother. She testified that she never joined with her husband, Hollowell, in making any deed to Lewis Johnson, but she and her husband deeded the lands to Nelvina Johnson.

And this was, in substance, all the appellee's proofs upon the contested points. Upon which pleadings and proofs the court found against appellants, and decreed that their complaint be dismissed for want of equity, and that they pay costs; from which decree they have appealed.

The examiners wrote down with the testimony, some matters of hearsay, statements in letters, etc., too remote to have any weight here, and the record shows such illegal evidence had none with the chancellor below.

The case exhibits the passion and prejudice of family quarrels, and presents the delicate duty of weighing testimony not reconcilable.

At law, where the facts are found by the jury, the appellate court is relieved by the rule that verdicts will not be disturbed when there is evidence to support them; reasons exist for this rule; witnesses are there brought face to face before the jury; they can see their demeanor, learn of their intelligence, hear them examined and cross-examined, judge of passions and prejudices that may prompt them to act, that corrupt their statements or bias their conclusions, and thus will determine the knowledge, fairness and integrity of each witness.

This rule cannot apply in a court of equity. All the testimony is committed to writing and submitted to that court in the same form and the same words that it is to this; hence the appellate court must pass upon the admissibility and weight of the testimony in the same manner that it should have been considered by the court below.

Mrs. Jones denied all ill feeling toward Nelvina Johnson, but the tenor of her testimony tended strongly to show that she believed that she had strong grounds of complaint. In speaking of Lewis Johnson acting as an agent, she expressed herself in terms stronger than the facts demanded, and many

of her details were more particular than fairness required; hence allowance may be made for prejudice in the case.

The testimony of Englebright was clearly subject to severe criticism. He asserts facts as well known, about which it seems he could not have had absolute knowledge. He showed a readiness to disclose everything that favored the appellants, and detailed statements as facts not consistent with experience. He admitted he had been paid $65 for coming, etc. He asserted positively that Hollowell and wife executed to Lewis Johnson a warranty deed, but he only saw the word warranty in the caption and the signatures at the conclusion, and while he read this he was riding on a trot; yet he says he is positive the deed conveyed 320 acres of land; he is positive Ellen F. Hollowell signed the deed; she swears positively she did not, and it seems Lewis never wrote he had a deed, and no one else pretends he had one, and Thomas testified that Lewis showed him a paper that he said was a title bond to these lands, a fact not consistent with a statement that he then had a deed. Englebright said Lewis told him he owed nothing, had paid for his land, and had money left; no other witness corroborates this; several contradicted it; and the circumstances tend to show it was not true. He asserts that Kimball cashed the checks; Kimball testified that he did not. In other things, he states strongly, and his evidence is entitled to very little weight.

The testimony of Mrs. Ricks is not marked by striking inconsistencies with much other testimony or established facts, yet it shows a diligence perhaps for the good of her children, about equal to those directly interested, and like Mrs. Jones, she is elaborate in details of admissions made by parties then in interest and hence may not be free from bias.

For the defense, Nelvina Johnson and her sons set out with a declaration of title in her and an assertion of actual, con-

tinuous, uninterrupted and adverse possession in phraseology more like an attorney's pleading than the statement of witnesses illiterate as some of them are shown to be, and, on material points, they all state very strongly and use words nearly the same. She testified she had such possession from the first of the year 1860, when Lewis did not die until in March of that year. One of the others testified that no one ever disputed their right or possession up to the present time, etc. They state very fully, that Lewis came to this state as Robert's agent to buy land; that he bought with Robert's money; that he wrote different letters to Robert, concerning the purchase, etc. They produce none of these letters nor do they account for their absence. They all state that it was the full understanding in the family that Lewis acted only as Robert's agent; that the whole $2,000 sent was Robert's; and that the lands were exclusively his, but no one else is produced who ever heard this mentioned among the family; and, except their lawyer and his sister, no one testifies to any declaration of Lewis or Robert, either before or afterward, tending to establish such facts. Why did no friend or neighbor, before or immediately after their deaths, hear this, and if so, why not produced when strong proof is offered to destroy that hypothesis? They say, only $1,500 of that $2,000 was paid on the land; yet no claim is set up for the other $500, or for the supplies and stock said to have been purchased with it, and the stock by Nelvina's direction was appraised as a part of Lewis' estate. In different ways they swear to the value and liabilities of Lewis' estate, and no one of them pretends to charge that estate with any part of that $500, nor do they show that Robert ever claimed or received any part of it back, and, indirectly, they show that he did not, because they show that Lewis was poor, had no money at and before the time they came here; that he wrote Robert that he did not

have means even to buy provisions. They assert that Lewis
was poor, but, except the statement of Green that when
Lewis left North Carolina he had nothing but an old buggy
and saddle and 60 or 65 acres of land, which it appears was
unsold, they do not state what he had, or why they re-
garded him as being poor. They assert that the $2,000
was Robert's, notwithstanding that is emphatically denied,
and proof made to show that he was unable to pay so
much. They make no attempt to show that he had money,
or how, when or where he procured that large amount. If
Robert handled very little money, as strongly stated by the
opposing testimony, he could not usually have raised $2,000
without making traces that could have been testified to. The
proof clearly shows that he made no sale of his own property
until several months after the payment was made to Hollo-
well, and is almost conclusive that he did not have the money
of his own, and if, by borrowing or other extraordinary means,
he procured it, it is strange no proof of such fact appears.

One of the appellants testified that Lewis probably had
$5,000 in means, and they produced Neflea, Pindar and Kille-
brew, who had lived fifty years in the neighborhood of the
family connection, and seem to be men of character, who testi-
fied that Lewis was of good habits, frugal and industrious, and
that for several years before he left North Carolina he was em-
ployed at high wages as an overseer, and the defendants in no
way show what became of his means, but assert he was poor.

Appellants not only swear directly against appellees, as to
Robert being agent for Lewis to collect money, etc., and that
the $2,000 sent was Lewis' money; but they show by these
old citizens, who seem disinterested, intelligent and credible,
that Robert many times asserted that he was collecting for
Lewis, and that this was Lewis' money, and he asked advice
as to remitting, etc., and claimed no interest in himself.

·The appellees assert that Lewis wrote to Robert and wife that he had contracted for land for them, etc. ; that he had no money; that they must send money to pay for the lands, etc., and important as such letters must have been, none are produced or accounted for, and no one outside of themselves ever saw them.

In addition to the testimony of Neflea, Pindar, Killebrew and others as to Robert's admissions, that he had no sufficient means, etc., there are the powerful admissions of appellees made soon after Lewis' death, in part testified to by witnesses, but more strongly shown by letter. Nelvina's letter to Killebrew, and Thaddeus' letter to his grandmother, state what they then considered their liability to Lewis' legal representatives, giving it at the value of the personal estate over the debts and the $1,500 paid on the land, equal to $1,650. They seemed fully under the impression that the title of the land was vested in Nelvina, but that she would have to repay the $1,500 Lewis had paid on the lands, and in corroboration of the statements made in the letters, it was proved that Nelvina had the personal property appraised, and said there would have to be an administration, etc., that she had arranged for title to the land, etc.

Nelvina and sons testify that Lewis did not claim the lands; this is contradicted by several letters written by Lewis to his near kin, by the testimony of Graves, Englebright and Thomas, as well as the admissions in those letters as to what Lewis had paid. Nelvina denies knowing that any letter was ever written in her name concerning Lewis' estate. Thaddeus denies any recollection of ever writing such letters; when the letters are produced he admits his handwriting in some; as to one he does not fully admit or deny — there is proof of the handwriting, and that the letters were received soon after their date by due course of mail. The strongest of these letters were to

Killebrew, who wrote for information, and who was the friend and selected agent of Robert Johnson. Thaddeus was in the habit of writing for his mother in 1860 and 1861, and these letters written at that time on such business, and some of them in response to inquiry, raise a strong presumption of their genuineness; but a stronger evidence is that they contain statements of facts, circumstances and business transactions, as they likely would have occurred; what is written of the estate is consistent with all the testimony since produced, except what is in defendants' depositions as referred to, and Nelvina's explanation is inconsistent with ordinary experience in such cases. She admits the plaintiffs are heirs of Lewis Johnson, and that she undertook to settle his estate by taking his property and paying his debts without authority from any court, but says she never had any letters written to any one in North Carolina concerning his estate. Now we cannot suppose that any one, who was designing to deal fairly with the other heirs, would dispose of the property and pay out some hundreds of dollars of debts and never write to those concerned, or answer inquiries made by them. We cannot assume that she did not wish to disclose the facts, because she denies all fraud and concealment, and declares that she was acting for the good of the estate. To further avoid the force of the letters produced, she says her children wrote what they pleased, and "they may have written about family matters." This reads like a subterfuge.

Thaddeus still lived in the family; was accustomed to write her letters; he must have understood the claims of the family to property as she spoke of them. If he stated what was understood in her family, she ought not to complain; if he thus stated falsehoods, when he knew they were such, he not only injured his mother, but convicted himself of such deliberate lying as to render him unfit to be a witness. But to suppose

that a son, who always had the advice and confidence of a mother, would falsely and deliberately write that the mother had effects to which she was not entitled, and thus stir up ill feeling and trouble between her and his grandmother, and to the damage of both, would be so inconsisfent with nature, humanity and common experience, that while any other conclusion can be had, we cannot so believe.

Nelvina says, to the best of her recollection she never wrote to Killebrew, who was their agent, etc. ; this is not only contrary to business experience, but contrary to what Killebrew swears.

In further avoidance, Thaddeus deposes that to the best of his recollection, he was not authorized by Nelvina to write that Lewis or his mother ever had any interest or claim in these lands; that he did not remember ever to have written anything about Lewis' property, but he might have done so, " as he was a rattling young man ; " that he was in the habit of writing letters for his mother in 1860 and 1861, and he sometimes read them over to her, and often he did not. Now whether he means to convey the idea that he was in the habit of forging his mother's name to what he had written, that was not directed or approved of by her; or whether he wrote what she requested him to do, and then signed her name without reading to her, is not so clear. If the latter, it was as much her letter as if she had penned it with her own hands; if the former, he was guilty of such crime as would disqualify him in court. He admits his handwriting in the letters, but virtually denies what is contained in them; yet he says he may have stated in some of his letters to his grandmother that she had an interest in these lands, but if so, it was contrary to the facts as they then existed, and as they now exist; "being young, wild and thoughtless." Now, how a boy, and much less a man, could be so "wild and thoughtless," as to

deliberately write to his aged grandmother that which he knew to be absolutely false, especially when what he was writing was calculated to involve both his grandmother and his own mother in trouble and costs, seems to us more than " wild thoughtlessness " could produce; and in that same letter he declares to the grandmother that he was and always has been her friend, and in favor of her having all the property of Lewis' estate, and so also was his mother.   These things were evidently written ; admissions are made that put their forgery out of the question.   If true, they should abide by them; if untrue, they were stranger than all fiction — deep dyed falsehoods, with all reason to the contrary.

Upon a careful searching out of all that relates to the questions finally at issue, and weighing it by all the tests known to the law, we are of opinion the evidence greatly preponderates in favor of the appellants.

We do not seriously doubt whose money paid for the lands; the testimony of Nelvina Johnson and her sons is so strangely contradicted by their own letters, by Lewis' letters, by the appellants' and much other testimony, and they have no corroborating testimony to give them support, except that of Jackoway and his sister, who testify what they understood from Lewis' conversations.   Their evidence is entitled to weight, but standing entirely alone, except as above stated, with full credit, it is not sufficient to balance the mass of testimony produced by the other party upon the same points.   This evidence (and so of some of the appellants) is of a class weak in itself — a statement of the memory or opinion of one upon casual conversations is never to be regarded as powerful evidence, and upon this point, more witnesses declare Lewis claimed the lands, and a number of his letters, written to those who were entitled to his confidence, set up his ownership in the lands, and they must prevail over the oral declarations as understood by Jackoway and sister.

Whether limitations run between these parties need not be discussed, as this suit was, in any event, brought in due time.

The supreme court of the United States, in more cases than one, have held that limitation did not run during the late civil war. *Hunger v. Abbott*, 6 Wal., 542; *The Protector*, 9 id., 687; *Levy v. Stewart*, 11 id., 244; id., 493; id., 508. And this court in the case of the *Metropolitan Nat. Bank of N. Y. v. Anderson Gorden*, not yet reported, followed that ruling.

So after a most careful consideration, we have arrived at a different conclusion from the learned chancellor who tried the cause below.

The defendants sufficiently show that the debts of Lewis' estate, paid by them, were about equal to his personal property. That property was not administered according to law, and they were liable in law to its conversion. Yet the appellants acquiesced therein for a long period, and then called the parties to account only in a court of equity, where equity must be done as well as demanded; therefore, without scrutinizing closely for small differences, the personal estate of Lewis will be set off against the debts paid by appellees.

It appears that the improvements by Nelvina and her family, made upon the lands, were over the value of the rents and profits; in fact the case is very loosely made in alleging and proving rents and profits. The counsel appears to have lost sight of this in establishing a right to the land. Nelvina voluntarily held possession of the lands, without right, only in so far as her children were heirs of Lewis Johnson; she cannot lawfully demand pay for betterments put thereon without the knowledge and consent of the other heirs, but as her children had an interest in these lands, remained thereon, and she and they did not unlawfully enter into possession, they could hold the same until partition was made, and while thus tacitly holding, they may be allowed to set off improvements

against rents and profits, but improvements not made with the knowledge and consent of the other heirs cannot be charged against the body of the estate.

And inasmuch as Nelvina saw fit to complete the payment for the lands under Lewis' purchase, the title executed to her must be considered as held in trust for Lewis' heirs; and upon the strongest equitable construction in her favor, she cannot be allowed more than the $500, advanced by her as a part of the purchase money, and the interest that had accrued thereon before it was paid; and this cannot, thereafter, bear interest, because the $1,500 paid by Lewis would be equally entitled to interest, and both will be treated as an investment.

We find that these lands were purchased by Lewis D. Johnson, for his own use; that $1,500 of the consideration was paid out of his own money, and that $500 and interest thereon from date of sale until April, 1860, was paid by Nelvina, out of her money, and that the deed was executed by Hollowell and wife to her in trust, etc.; that the lands cannot equitably be divided, etc.

The decree of the court below is reversed and the cause remanded with directions to that court to decree the title of the lands to the heirs of Lewis D. Johnson according to their respective inheritance, under the statute laws of this state; that a commissioner be appointed and ordered to sell said lands upon such reasonable time as may be deemed best, not less than is given for redemption in ordering judicial sales; that purchasers be required to give good security and the title withheld until full payment is made. That next after the payment of costs of sale, that $500, and what interest accrued thereon up to April, 1860, be paid to Nelvina Johnson, except the reservation of the costs decreed against her, and all the remainder distributed according to the interest of the respective heirs of Lewis D. Johnson. That all the costs of this

suit, to this date, be decreed against the defendants; and such commissioner be required, under sufficient bonds, to faithfully demean himself, make due reports, settlements, etc.